**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 25 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

PRAIRIE BAND OF POTAWATOMI
INDIANS,

        Plaintiff-Appellee,

    v.

KARLA PIERCE, Secretary of
Revenue, State of Kansas; SHEILA
WALKER, Director of Vehicles, State
of Kansas; and DON BROWNLEE,
Superintendent, Kansas Highway
Patrol,

        Defendants-Appellants.

No. 99-3324

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 99-CV-4136-DES)**

---

John Michael Hale, Kansas Department of Revenue, Topeka, Kansas (M.J. Willoughby, Office of the Attorney General, Topeka, Kansas; Richard L. Cram, Kansas Department of Revenue, Topeka, Kansas, with him on the briefs) for the Defendants-Appellants.

David Prager III, General Counsel, Prairie Band of Potawatomi Indians, Mayetta, Kansas, for the Plaintiff-Appellee.

Before **EBEL** , **HENRY** , Circuit Judges, and   **WEINSHIENK** , District Judge.  [1]

**HENRY** , Circuit Judge.

Seeking to have its motor vehicle registrations and titles recognized by the state of Kansas, the Prairie Band of Potawatomi Indians, a Kansas Indian tribe, filed suit against various Kansas state officials pursuant to the Indian Commerce Clause, the Kansas Act for Admission, and other federal law.  During the proceedings below, the district court issued a temporary restraining order ("TRO") and thereafter a preliminary injunction, each of which prohibited further enforcement of the state motor vehicle registration and titling laws with respect to vehicles registered and titled by the tribe.  The state officials then filed this interlocutory appeal, challenging the preliminary injunction on various grounds. We affirm for the reasons set forth below.

## I. BACKGROUND

---

[1]  Honorable Zita L. Weinshienk, United States District Judge for the District of Colorado, sitting by designation.

The Prairie Band of Potawatomi Indians (the "tribe") is a federally recognized Indian tribe with a reservation located in Jackson County, Kansas. On March 16, 1999, as a response to "a significant increase in the amount of motor vehicle traffic on the reservation," the tribe enacted its own motor vehicle code. Aplts' App. vol. I, at 16 (Prairie Band Motor Vehicle Code ("PBMVC") Ch. 17-1). The purpose of the code was "to implement reasonable rules, regulations, and penalties essential to maintaining a safe transportation system within the [tribal] jurisdiction." Id.

Under the code, tribal registrations and titles are required for all vehicles owned by the tribal government and for all vehicles owned by tribal members who reside on the reservation. See PBMVC § 17-10-1(B). Registration involves "the act of assigning a registration plate [i.e., a license] and validation sticker(s) to a vehicle, and to renew the same." Id. § 17-10-2(H). Titling involves, among other things, proof of ownership. See id. Ch. 17-10 (noting "the issuance of certificates of title for conveyance of ownership"); see also id. § 17-10-19 to -35 (various tribal statutes on certificates of title). A certificate of title "is a prerequisite to registration of [a] vehicle." Id. § 17-10-4(D).

Prior to the enactment of the tribal motor vehicle code, the tribe and its members complied with the motor vehicle code of Kansas. Under the state code,

all vehicles that operate in Kansas are required to have registrations and titles

issued by the state.    See Kan. Stat. Ann. § 8-142.  [2]  Violators may be cited and are

subject to imprisonment and/or a fine.      See id.; see also  id. § 8-149.  Gratefully,

an exception is made for nonresidents.  Nonresidents who operate vehicles in

Kansas are not considered violators if they are properly registered and titled in the

state of their residence and if the state of their residence grants reciprocal

---

[2]  Section 8-142 provides in part:

It shall be unlawful for any person to commit any of the
following acts and except as otherwise provided, violation is subject
to penalties provided in K.S.A. 8-149, and amendments thereto:

First:  To operate, or for the owner thereof knowingly to
permit the operation, upon a highway of any vehicle, as defined in
K.S.A. 8-126, and amendments thereto, which is not registered, or
for which a certificate of title has not been issued or which does not
have attached thereto and displayed thereon the license plate or
plates assigned thereto by the division for the current registration
year, including any registration decal required to be affixed to any
such license plate pursuant to K.S.A. 8-134, and amendments thereto,
subject to the exemptions allowed in K.S.A. 8-135, 8-198[,] and 8-
1751a, and amendments thereto.

Second:  To display or cause or permit to be displayed, or to
have in possession, any registration receipt, certificate of title,
registration license plate, registration decal, accessible parking
placard or accessible parking identification card knowing the same to
be fictitious or to have been canceled, revoked, suspended or altered.

Kan. Stat. Ann. § 8-142.

recognition to the registrations and titles of Kansas. See Kan. Stat. Ann. § 8-138a.[3]

On April 27, 1999, approximately a month after the enactment of its motor vehicle code, the tribe issued its first registration and title to a tribal member by the name of Vestina Nonken. See Aplts' App. vol. I, at 104 (affidavit of David Danielson, tribal motor vehicle registrar). Having received indications from state officials that tribal registrations and titles would not be recognized outside the reservation, the tribe apparently hoped that Ms. Nonken would be cited so that a challenge could thereby be made to the state motor vehicle registration and titling

---

[3] Section 8-138a states that:

> The provisions of this section shall apply only to the nonresident owner or owners of any motor vehicle constructed and operated primarily for the transportation of the driver or the driver and one or more nonpaying passengers. Such nonresident owners, when duly licensed in the state of residence, are hereby granted the privilege of operation of any such vehicle within this state to the extent that reciprocal privileges are granted to residents of this state by the state of residence of such nonresident owner.

Kan. Stat. Ann. § 8-138a. Interestingly, this provision allows for the recognition of registrations and titles issued by tribes residing *outside* of Kansas. See State v. Wakole, 959 P.2d 882, 885-86 (Kan. 1998) (noting that the state of Oklahoma recognized an Oklahoma tribe's license plates as valid for use on Oklahoma highways; thus, holding that a vehicle with the Oklahoma tribe's license plate was "duly licensed" under Kan. Stat. Ann. § 8-138a).

laws as applied to the tribe and its members. For two months, the tribe asked various state officials to cite Ms. Nonken, but no citation was ever issued.

Thereafter, during the week of June 28, 1999, the tribe proceeded to issue more registrations and titles. See id. vol. III, at 8 (counsel for tribe at TRO hearing) (stating that by June 1999 there were approximately twenty tribal registrations and titles in use). For more than a month, these registrations and titles remained unchallenged by the state. It was not until August 7, 1999, approximately three months after the first registration and title was issued by the tribe, that a tribal member was finally cited for using a tribal registration and title outside the reservation, a purported violation of Kan. Stat. Ann. § 8-142. See id. vol. I, at 158 (citation issued to Joseph P. Rupnick). Two more citations and a warning ticket were subsequently issued, all during the first two weeks of September 1999 and all pursuant to § 8-142. See id. at 157, 159, 160 (citations or warning tickets issued to Willie J. Potts, Nathaniel J. Potts, and Joseph H. Mattwaoshshe). Of the three citations, two were ultimately dismissed and the last resolved by payment of a fine. See Aplts' App. vol. III, at 11 (counsel for tribe at TRO hearing); id. at 103 (counsel for tribe at clarification hearing).

-6-

On September 14, 1999, the tribe filed a complaint against Karla Pierce, secretary of revenue for the state of Kansas; Sheila Walker, director of vehicles for the state of Kansas; and Don Brownlee, superintendent for the Kansas Highway Patrol, alleging that the state was compelled to grant recognition to tribal motor vehicle registrations and titles pursuant to the Indian Commerce Clause, the Kansas Act for Admission, and other federal law. On the same day, the tribe filed a motion for a TRO and preliminary injunction, asking that the district court "enjoin the Defendants from enforcing the Kansas motor vehicle registration and titling laws against the Plaintiff and any persons who operate or own a vehicle registered and titled under [the] Tribal Code § 17-10-1     et seq. " Aplts' App. vol. I, at 89 (tribe's motion for a TRO and preliminary injunction).

After conducting a hearing, the district court granted the tribe a TRO. In response, the defendants asked the district court to (1) provide specific findings of fact to justify the issuance of the TRO, (2) clarify the scope and extent of the TRO, (3) clarify that the TRO was in effect a preliminary injunction, and (4) stay the TRO pending appeal. With respect to the first request, the district court refused, stating that "the record is sufficiently clear as to the basis for the issuance of the TRO."     Id. vol. II, at 138 (district court order, filed Oct. 13,

1999).  It did, however, provide some clarification as to the scope and extent of the TRO, and it also granted the tribe a preliminary injunction.  Finally, the district court rejected the application for stay, noting that "[i]f the court were to issue the requested stay, the tribal members protected by the injunction would immediately become vulnerable to the arrests, citations[,] and related legal matters."  Id. at 141 (district court order, filed Oct. 13, 1999).

The defendants subsequently appealed the denial of stay to this court, arguing that "[t]he district court's order does not preserve but rather changes the status quo because it frees the tribe to issue as many tribal tags and registrations to whomever it wishes."  Aplts' App. for Stay at 5 (filed Oct. 15, 1999).  This court held in favor of the defendants, granting a stay pending appeal.  It concluded:  "[I]t is appropriate to preserve the status quo as it existed prior to the district court's entry of the injunction pending determination of the issues on appeal."  10th Cir. Order at 2 (filed Nov. 9, 1999).

III.  DISCUSSION

Prior to oral argument, the tribe filed a motion with this court, asking that we dismiss the appeal of the preliminary injunction as moot.       See Aple's Mot. to Vacate Inj. & Dismiss Appeal at 3-4 (filed Dec. 30, 1999) (noting that the tribe "reduced the number of tribally registered and titled vehicles to the point where the Nation longer desires to pursue an injunction").  During oral argument, however, the tribe conceded that the appeal was not moot, and we therefore address the two major arguments raised by the defendants:  (1) that the district court did not have jurisdiction over the instant case and (2) that the district court abused its discretion in issuing the preliminary injunction.

A.  Jurisdiction

    1.  Federal Question Jurisdiction

According to the defendants, the district court lacked jurisdiction over the instant case because the tribe did not raise a "colorable federal claim."  Aplts' Br. at 41.  As a preliminary matter, we note that the defendants did not bring this issue to the attention of the district court during the proceedings below.  That failure, however, does not preclude our review because, "[s]o long as a case is pending, the issue of federal court jurisdiction may be raised at any stage of the

-9-

proceedings either by the parties or by the court on its own motion." Ramey Constr. Co. v. Apache Tribe of the Mescalero Reservation, 673 F.2d 315, 318 (10th Cir. 1982).

The defendants are correct in noting that a federal claim must be colorable to establish federal question jurisdiction. See Aldinger v. Howard, 427 U.S. 1, 7 (1976) ("[W]here federal jurisdiction is properly based on a colorable federal claim, the court has the right to decide all the questions in the case . . . .") (citation and internal quotation marks omitted); BIW Deceived v. Local S6, Industrial Union of Marine & Shipbuilding Workers of America, IAMAW, 132 F.3d 824, 832 (1st Cir. 1997) ("As a matter of common practice, a district court confronted with a question of subject matter jurisdiction reviews a plaintiff's complaint not to judge the merits, but to determine whether the court has the authority to proceed. When conducting this inquiry, the court only asks whether the complaint, on its face, asserts a colorable federal claim.").

But the defendants improperly suggest that a claim is colorable only when it must succeed on the merits. We are unaware of any case that defines colorability in such strict terms; indeed, a review of case law demonstrates otherwise. For example, the First Circuit has defined "colorable" as "'seemingly valid or genuine,'" BIW, 132 F.3d at 832 n.4 (quoting Webster's New Collegiate

Dictionary 220 (1981)); the Eighth as "not without some merit," Jensen v.

Schweiker , 709 F.2d 1227, 1230 n.2 (8th Cir. 1983); and the Ninth as not "wholly

insubstantial, immaterial, or frivolous." Boettcher v. Secretary of Health & Hum.

Servs. , 759 F.2d 719, 722 (9th Cir. 1985).

In this circuit, "colorable" has been similarly – and generously – defined.

In Harline v. DEA , 148 F.3d 1199 (10th Cir. 1998), for example, we held that

> [t]o determine whether a claim is colorable, it is necessary to examine its merits. A determination that a claim lacks merit, however, does not necessarily mean it is so lacking as to fail the colorable test. A . . . claim . . . is not colorable if it is immaterial and made solely for the purpose of obtaining jurisdiction or . . . is wholly insubstantial or frivolous.

Id. at 1203 (internal quotation marks omitted); see also United States v. McAleer ,

138 F.3d 852, 857 (10th Cir. 1998) (defining "colorable" as having "some

possible validity").

Given these liberal definitions, we conclude that, in the instant case, the

tribe did raise a colorable federal claim. The tribe alleged in its complaint that,

under federal law – in particular, the Indian Commerce Clause and the Kansas Act

for Admission – the state was required to extend recognition to the motor vehicle

registrations and titles issued by the tribe. This claim was not "wholly

insubstantial or frivolous" in light of the various Supreme Court cases in which

-11-

the validity of state motor vehicle laws as applied to tribes and their members was challenged on similar grounds. See, e.g., Oklahoma Tax Comm'n v. Sac & Fox Nation, 508 U.S. 114, 127 (1993) (questioning the validity of a state motor vehicle excise tax and registration fee as applied to a tribe and its members); Washington v. Confederated Tribes of the Colville Indian Reservation, 447 U.S. 134, 162-64 (1980) (concluding that a state lacked authority to impose a motor vehicle excise tax upon a tribe and its members when the tax was not "tailored to the amount of actual off-reservation use"); Moe v. Confederated Salish & Kootenai Tribes of the Flathead Reservation, 425 U.S. 463, 480-81 (1976) (concluding that a state personal property tax on motor vehicles was invalid as to a tribe and its members). We also take note of cases such as Red Lake Band of Chippewa Indians v. State, 248 N.W.2d 722 (Minn. 1976), and Queets Band of Indians v. Washington, 765 F.2d 1399 (9th Cir. 1985), vacated as moot, 783 F.2d 154 (1986), each of which involved a tribal challenge to state motor vehicle registration and titling laws on the basis of federal law.

2. Article III Case or Controversy and Standing

The next issue raised by the defendants is whether the tribe's claim presents an Article III case or controversy. Though the defendants raised this issue below,

-12-

the district court did not address it, simply granting the TRO and preliminary injunction to the tribe without comment. "We review de novo issues . . . that are prerequisites to this court's jurisdiction." Office of Thrift Supervision v. Overland Park Fin. Corp. (In re Overland Park Financial Corp.), 236 F.3d 1246, 1253-54 (10th Cir. 2001).

Article III provides that the exercise of the "judicial Power" is restricted to actual "cases" and "controversies." U.S. Const. art. III, § 2. Therefore, under Article III, a federal court is prohibited from entertaining a case in which the issues are not yet ripe, in which the issues are moot, or in which the parties lack a legally cognizable interest in the outcome. See U.S. West, Inc. v. Tristani, 182 F.3d 1202, 1208 (10th Cir. 1999) (noting that "[t]he case or controversy requirement of Article III admonishes federal courts to avoid premature adjudication and to abstain from entangling themselves in abstract disagreements") (internal quotation marks omitted), cert. denied, 528 U.S. 1106 (2000); Central Wyo. Law Assoc., P.C. v. Denhardt, 60 F.3d 684, 687 (10th Cir. 1995) (noting that, under the case-or-controversy limitation of Article III, a case must be live and not moot); AMISUB (PSL), Inc. v. State of Colo. Dep't of Soc. Servs., 879 F.2d 789, 794 (10th Cir. 1989) (noting that, if a party "does not have a legally cognizable interest in the outcome of the case, no live controversy exists

– any issuing federal opinion would be purely advisory, and, as such, prohibited by Article III").

Because there are live issues before us waiting to be resolved, we hold that the instant case is neither lacking in ripeness nor moot. Though the tribe has ceased issuing registrations and titles since the stay of the preliminary injunction, it has done so on a temporary basis only; moreover, the tribal motor vehicle code has not been repealed, and there are still four vehicles with tribal registrations and titles in use.

As to the defendants' contention that there is no case or controversy because the tribe lacks a legally cognizable interest, that matter is better addressed in the context of standing, which is another issue raised by the defendants. See Citizens Concerned for Separation of Church & St. v. City & Cty. of Denver , 628 F.2d 1289, 1294 (10th Cir. 1980) (noting that "the standing doctrine has evolved as a doctrine of constitutional limitation on the federal judicial power found in the 'case or controversy' language of Article III"). As before, the defendants argued this issue below, but the district court did not specifically address it when granting the TRO and preliminary injunction. We apply de novo review. See Overland Park , 236 F.3d at 1253-54.

> Standing is an essential part of the case-or-controversy requirement and involves three elements. First, the plaintiff must have suffered an invasion of a legally-protected interest that is concrete and particularized, and actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the complained of conduct; that is, the injury must be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court. Finally, it must be likely, not merely speculative, that the injury will be redressed by a favorable decision.

Gilbert v. Shalala, 45 F.3d 1391, 1393-94 (10th Cir. 1995) (citations and internal quotation marks omitted).

According to the defendants, the tribe does not have standing because it has not suffered any injury through the state's refusal to grant recognition to the tribally issued registrations and titles. We disagree. Motor vehicle registration and titling is a traditional governmental function. See Crow Tribe of Indians v. Montana, 650 F.2d 1104, 1110 (9th Cir. 1981); Red Lake, 248 N.W.2d at 725. The state's refusal to extend recognition, therefore, causes an obvious harm to the tribe: interference with or infringement on tribal self-government. Cf. Moe, 425 U.S. at 469 n.7 (addressing tribe's contention that state motor vehicle tax could not be imposed on tribe and its members and noting that "the Tribe, Qua Tribe, ha[d] a discrete claim of injury with respect to these forms of state taxation so as to confer standing upon it apart from the monetary injury asserted by the

-15-

individual [tribal members]"). Protection of that right is the foundation of federal Indian law; accordingly, we conclude that the tribe has standing.

### 3. Younger Abstention

In addition to these jurisdictional arguments, the defendants argue that the district court should have abstained under Younger v. Harris, 401 U.S. 37 (1971). During the proceedings below, the district court found that "the parties agreed that Younger abstention was not applicable," Aplts' Br. at 45, and therefore did not address it. On appeal, the defendants contend that they never conceded the point and, from the record, it appears that this is true. See Aplts' App. vol. III, at 103 (counsel for tribe, not defendants, arguing at clarification hearing that the Younger abstention issue was moot). We review the issue de novo. See J.B. ex rel. Hart v. Valdez, 186 F.3d 1280, 1291 (10th Cir. 1999).

Younger abstention is predicated on the "desire to permit state courts to try state cases free from interference by federal courts." Younger, 401 U.S. at 43. Under Younger, it is appropriate for a federal court to abstain from hearing a case if (1) a state judicial proceeding is ongoing; (2) an important state interest is at stake; and (3) there is an adequate opportunity in the state proceeding to raise

federal claims. See Seneca-Cayuga Tribe of Okla. v. Oklahoma, 874 F.2d 709, 711 (10th Cir. 1989).

The defendants suggest that we should abstain in the instant case because future prosecutions based on a failure to comply with the state motor vehicle registration and titling laws are possible. The possibility of future prosecutions, however – even the likelihood of future prosecutions – is not sufficient to justify Younger abstention. As noted above, before Younger abstention may be invoked, "there must be an *ongoing* state . . . proceeding[]," Taylor v. Jaquez, 126 F.3d 1294, 1297 (10th Cir. 1997) (emphasis added). Because the defendants have not pointed to any such state proceeding (all citations issued to the tribe or its members having been resolved), Younger abstention is patently inapplicable.

B. Preliminary Injunction

Having addressed the defendants' jurisdictional arguments, we now proceed to the defendants' challenge to the preliminary injunction entered by the district court. As noted above, the district court enjoined the defendants from "any further application or enforcement of the Kansas motor vehicle registration or titling laws against the [tribe] and any persons who operate or own a vehicle registered and titled under [the] Tribal Code . . . ." Aplts' App. vol. II, at 143

-17-

(district court order, filed Oct. 13, 1999).

The defendants contend that the district court erred in granting this injunctive relief on several grounds. First, they assert that the preliminary injunction was not sufficiently specific as required by Federal Rule of Civil Procedure 65(d). Second, they argue that as a matter of law the district court applied the wrong standard in deciding to issue the preliminary injunction. Finally, they contend that, even if the district court applied the proper standard, the tribe failed to demonstrate that a preliminary injunction was necessary. We review de novo the issue of specificity under Rule 65(d). See Reliance Ins. Co. v. Mast Constr. Co. , 159 F.3d 1311, 1316 (10th Cir. 1998). We review for an abuse of discretion the grant of a preliminary injunction. See ACLU v. Johnson , 194 F.3d 1149, 1155 (10th Cir. 1999). A district court abuses its discretion if it "commits an error of law, or is clearly erroneous in its preliminary factual findings." Id. (internal quotation marks omitted).

### 1. Specificity: Federal Rules of Civil Procedure 65(d) and 52(a)

On appeal, the defendants first argue that the preliminary injunction granted by the district court was not sufficiently specific as required by Federal Rule of Civil Procedure 65(d). According to the state, it was not clear from the

-18-

district court order "precisely what acts [were being] forbidden." Aplts' Br. at 33.

> Rule 65(d) provides that
>
> [e]very order granting an injunction . . . shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

Fed. R. Civ. P. 65(d). "[T]he specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." Schmidt v. Lessard, 414 U.S. 473, 476 (1974) (per curiam); see also Keyes v. School Dist. No. 1, Denver, Colo., 895 F.2d 659, 668 (10th Cir. 1990) (noting that "an injunction [must] be reasonably specific in identifying what acts are prohibited or required, both to give notice to the defendant of what is prohibited, and to guide an appellate court in reviewing the defendant's compliance or noncompliance with the injunction").

However, Rule 65(d) does not require the impossible. See Reliance, 159 F.3d at 1316-17 ("'There is a limit to what words can convey. . . . The right to seek clarification or modification of the injunction provides assurance, if any be sought, that proposed conduct is not proscribed.'") (quoting Scandia Down Corp. v. Euroquilt, Inc., 772 F.2d 1423, 1431-32 (7th Cir. 1985)); see also Johnson v. Radford, 449 F.2d 115, 117 (5th Cir. 1971) ("A temporary injunction is intended to be temporary, to meet the exigencies of the situation, and necessarily at times lacks the degree of precision which may be required on final decree."). A preliminary injunction is vague only when "the delineation of the proscribed activity lacks particularity or when containing only an abstract conclusion of law, not an operative command capable of enforcement." CF&I Steel Corp. v. United Mine Workers of America, 507 F.2d 170, 173 (10th Cir. 1974) (internal quotation marks omitted).

Here, the preliminary injunction provided that the state was barred from "any further application and enforcement of the Kansas motor vehicle registration or titling laws against the [tribe] and any persons who operate or own a vehicle registered and titled under [the tribal motor vehicle code]. This order applies to vehicles driven both on and off of the [tribe's] reservation." Aplts' App. vol. II, at 143 (district court order, filed Oct. 13, 1999). The order also stated that "[t]his

-20-

injection is not meant to have any effect on cases which are currently pending before any Kansas state court and is not meant to have any effect on Kansas traffic laws that do not deal directly with vehicle registration, vehicle license plates[,] and motor vehicle titles." Id.

We are at a loss as to how this order was inadequate under Rule 65(d). At issue in this case is whether the state must grant recognition to motor vehicle registrations and titles issued by the tribe. The preliminary injunction addressed this issue head on and stated precisely what conduct was being enjoined: Vehicles registered and titled by the tribe could not be cited for noncompliance with state registration and titling laws. Notably, the defendants in their brief fail to explain how the preliminary injunction was lacking, simply stating in conclusory terms that "the order of injunctive relief fails to meet the specificity standards [of Rule 65]." Aplts' Br. at 32.

During the proceedings below, the defendants did argue that the *TRO* was not sufficiently specific because it was "unclear or perhaps subject to interpretation what the term[s] applying and enforcing [as used in the TRO] mean[t]." Aplts' App. vol. III, at 28. The defendants also argued that it was "unclear" as to whether "the [TRO] only applie[d] to [Kan. Stat. Ann. §] 8-142, which is the issuance of traffic tickets," or was broader in "scope and extent." Id.

-21-

at 76-77.  To the extent that these are the defendants' grounds for challenging the *preliminary injunction*, we hold that they are meritless.  There was nothing vague about the use of the words "apply" and "enforce" in the district court's order; indeed, it is the norm to speak of the application and enforcement of laws.  Nor was the scope and extent of the preliminary injunction unclear simply because the order did not list the exact state laws that could not be applied to the tribe and its members.  It is sufficient that the preliminary injunction provided that "[t]his injunction is not meant to have any effect . . . on Kansas traffic laws that do not deal *directly* with vehicle registration, vehicle license plates[,] and motor vehicle titles."  Aplts' App. vol. II, at 143 (district court order, filed Oct. 13, 1999) (emphasis added);  cf. Reliance , 159 F.3d at 1316 ("Rule 65(d) requires only that the enjoined conduct be described in reasonable, not excessive, detail – particularly in cases like this when overly precise terms would permit the very conduct sought to be enjoined.").

Though the preliminary injunction is in accord with Rule 65(d), there is some question as to whether it complies with Federal Rule of Civil Procedure 52(a).  Under Rule 52(a), a district court is required to make findings of fact and conclusions of law at the time it enters a preliminary injunction.     See Fed. R. Civ. P. 52(a);  Mesa Petroleum Co. v. Cities Serv. Co.     , 715 F.2d 1425, 1433 (10th Cir.

-22-

1983). Our concern here is with the adequacy of the findings and conclusions made by the district court.

As a preliminary matter, we note that the defendants do not explicitly raise this argument on appeal. However, we are compelled to address the issue because, without adequate findings of fact and conclusions of law, appellate review is in general not possible. See Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp., 15 F.3d 1222, 1227 (1st Cir. 1994) (noting that Rule 52(a) requires a trial court to "set forth the findings of fact and conclusions of law which constitute the grounds of its action" and that the rule "reflects the importance of injunctions and of providing an adequate basis for their appellate review") (internal quotation marks omitted); Curtis v. Commissioner, 623 F.2d 1047, 1051 (10th Cir. 1980) (noting that a trial court's findings of fact "may be challenged as inadequate to give a clear understanding of the process by which the court's ultimate conclusions were reached and thus inadequate to permit appellate review").

In the instant case, the district court made no explicit factual findings or legal conclusions when it issued the preliminary injunction. See Aplts' App. vol. II, at 143 (district court order, filed Oct. 13, 1999) (simply granting the preliminary injunction and stating its parameters). It did, however, give findings of fact and conclusions of law when it granted the TRO. For purposes of this

opinion, we assume that it is proper for us to look to the findings and conclusions in the TRO because the parties agreed that the TRO was in effect a preliminary injunction. See id. vol. II, at 93 (defendants' request for clarification, filed Sept. 27, 1999) (noting that the TRO was in effect a preliminary injunction); id. vol. III, at 89 (counsel for tribe at clarification hearing) ("So the way I see this hearing [for clarification] today is . . . we are ready to have the Court determine that a preliminary injunction should be issued.").

In granting the TRO, the district court made the following findings of fact and conclusions of law:

> The court finds that if the defendants are not enjoined from enforcing the Kansas motor vehicle registration and titling laws pending the outcome of this case, the plaintiff would suffer irreparable injury. The court has considered the parties' arguments concerning the balancing of potential injury to the parties and finds that the potential harm to the plaintiff if the temporary restraining order is not issued outweighs any potential harm to the defendants which would be caused by the issuance of the order. The court further finds that the issuance of this temporary restraining order would not be contrary to the public interest.
>
> If the plaintiff satisfies the first three elements, the standard for meeting the fourth requirement, likelihood of prevailing on the merits, becomes more lenient. In such a case, the plaintiff need only show that the issues are so serious, substantial, difficult, and doubtful as to make them fair ground for litigation. Given this standard, the court finds that the plaintiff has met its burden of showing a likelihood of prevailing on the merits.

-24-

Id. vol. II, at 85-86 (district court order, filed Sept. 23, 1999) (citation omitted).

Though we accord great deference to the district court, we believe that these findings do not give a clear understanding of the process by which its ultimate conclusions were reached. Although Rule 52(a) does not require "over-elaboration of detail or particularization of facts," conclusory findings are not sufficient compliance with the Federal Rules of Civil Procedure. Knapp, 15 F.3d at 1228 (internal quotation marks omitted); see also EEOC v. United Virginia Bank/Seaboard Nat., 555 F.2d 403, 406 (4th Cir. 1977) ("When the trial court provides only conclusory findings, illuminated by no subsidiary findings or reasoning on all the relevant facts, . . . there is not that 'detail and exactness' on the material issues of fact necessary for an understanding by an appellate court of the factual basis for the trial court's findings and conclusions . . . .").

There are times, however, when a district court's failure to comply with Rule 52(a) will not necessitate a remand for clarification. For example, it has been held that a court of appeals can consider a district court's failure to make adequate findings of fact as nonreversible error if it can ascertain from the record that one party or the other was clearly entitled to judgment in its favor. See Kweskin v. Finkelstein, 223 F.2d 677, 679 (7th Cir. 1955); see also United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enterprise Mgmt.

Consultants, Inc., 883 F.2d 886, 889 (10th Cir. 1989) (noting the same). It has also been held that, if "[t]here is . . . no danger of confusion about what is required by the order or the basis of the decision [and] the record on appeal supports the court's order and indicates the court heard evidence on each element[,] . . . any lack of specific findings of fact is harmless error." Anthony v. Texaco, Inc., 803 F.2d 593, 600 (10th Cir. 1986) (citations omitted). Accordingly, we conclude that, in the instant case, a remand for clarification is not necessary: It was clear from the preliminary injunction what activity was being proscribed, and the record on appeal indicates not only that the district court heard evidence on the matter but also that the evidence supported issuance of the preliminary injunction.

### 2. Preliminary Injunction Standard

The defendants argue next that the district court applied the wrong standard in deciding to grant the tribe the preliminary injunction. See SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1098 (10th Cir. 1991) (noting that this court "will set aside a preliminary injunction if the district court applied the wrong standard when deciding to grant the preliminary injunction motion"). Ordinarily, a party seeking a preliminary injunction must satisfy a four-factor test in order to be

-26-

awarded such temporary relief. The requesting party must demonstrate (1) that it has a substantial likelihood of prevailing on the merits; (2) that it will suffer irreparable harm unless the preliminary injunction is issued; (3) that the threatened injury outweighs the harm the preliminary injunction might cause the opposing party; and (4) that the preliminary injunction if issued will not adversely affect the public interest. See Federal Lands Legal Consortium v. United States, 195 F.3d 1190, 1194 (10th Cir. 1999) [hereinafter FLLC]. "As a preliminary injunction is an extraordinary remedy, the [requesting party's] right to relief must be clear and unequivocal." Visa, 936 F.2d 1098 (citation omitted).

That being said, there is one slight wrinkle to this four-factor test. If the party seeking the preliminary injunction can establish the last three factors listed above, then the first factor becomes less strict – i.e., instead of showing a substantial likelihood of success, the party need only prove that there are "questions going to the merits . . . so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." FLLC, 195 F.3d at 1194.

In the instant case, the district court applied this "traditional" standard, finding that the tribe had satisfied the last three factors and that it had also met the first factor under the more lenient formulation. It therefore granted the tribe

the preliminary injunction, enjoining the defendants from enforcing the state registration and titling laws with respect to the tribe and its members. On appeal, the defendants argue that the traditional standard should not have been used because the preliminary injunction issued by the district court (1) afforded the tribe substantially all the relief it might recover after a full trial on the merits and (2) disturbed the status quo. According to the defendants, these types of preliminary injunctions are disfavored, and, before a disfavored preliminary injunction may be granted, the requesting party must satisfy a "heightened" standard – i.e., demonstrate that the four factors listed above weigh "heavily and compellingly" in its favor. [4] See Kikumura v. Hurley, No. 99-1284, 2001 WL 237373, at *3 (10th Cir. Mar. 9, 2001) (internal quotation marks omitted).

### a. Granting Substantially All the Relief Sought

---

[4] In this circuit, there are three types of preliminary injunctions that are disfavored: (1) those that afford the moving party substantially all the relief it might recover after a full trial on the merits, (2) those that disturb the status quo, and (3) those that are mandatory as opposed to prohibitory. See Visa, 936 F.2d at 1098-99. In the instant case, the defendants do not sufficiently argue that the preliminary injunction was mandatory in nature. See King v. Town of Hanover, 116 F.3d 965, 970 (1st Cir. 1997) ("It is an established appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. . . . It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work.") (internal quotation marks omitted).

As a preliminary matter, we note that the defendants never argued before the district court that a heightened standard should apply on the ground that the preliminary injunction desired by the tribe would afford it substantially all the relief it might recover. In light of this fact, we consider the argument waived. See Vitkus v. Beatrice Co., 127 F.3d 936, 946 (10th Cir. 1997) ("As a general rule, a federal court of appeals will not consider an issue not passed upon below.").

Even if the argument had been properly presented, we would not rule in the defendants' favor. "[T]he terms 'all the relief to which the movant would be entitled' or 'all the relief sought' have . . . been the source of confusion because, read literally, they appear to describe any injunction where the final relief for the plaintiff would simply be a continuation of the preliminary relief." Tom Doherty Assoc., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 34 (2d Cir. 1995). There is no reason, however, to disfavor a preliminary injunction simply because "the plaintiff would get no additional relief if he prevailed at the trial on the merits." Id. (internal quotation marks omitted). The only reason to disfavor a preliminary injunction that grants substantially all the relief sought is if it would "render a trial on the merits largely or completely meaningless." Id. at 35. Therefore, "'all the relief to which a plaintiff may be entitled' must be supplemented by a further

-29-

requirement that the effect of the order, once complied with, cannot be undone."
Id.; see also id. (giving examples of preliminary relief that cannot be undone – for instance, "a case involving the live televising of an event scheduled for the day on which preliminary relief is granted" or "a case involving the disclosure of confidential information").

In the instant case, the relief ultimately sought by the tribe was state recognition of its registrations and titles. The preliminary injunction issued by the district court gave the tribe at most only *temporary* recognition, not permanent. In other words, if the tribe was not successful at trial, then the defendants would be permitted to cite any vehicle with a tribal registration and title. Therefore, the preliminary injunction granted by the district court did not, as the defendants contend, afford the tribe substantially all the relief it might recover. This interim relief, quite simply, was not "complete." Eng v. Smith, 849 F.2d 80, 82 (2d Cir. 1988).

### b. Altering the Status Quo

During the proceedings below, the defendants suggested to the district court that a heightened standard, and not the traditional one, should apply because the injunctive relief sought by the tribe would change the status quo. More

specifically,   Mr. Brownlee asserted, in his response to the tribe's motion for a

TRO, that "[c]ourts have applied certain additional standards in judging a request

for injunctive relief which should be considered with regard to the tribe's present

motion for TRO . . . . [For example,] an injunction will not issue which has the

effect of disturbing the status quo."  Aplts' App. vol. II, at 46 (Mr. Brownlee's

response to tribe's motion for a TRO, filed Sept. 25, 1999).  Nothing more was

said on the status quo issue, though, until the clarification hearing on October 7,

1999, in which the district court responded to the defendants' "objections" to the

issuance of the TRO.

During that hearing, the defendants for the first time articulated with any

substance their status quo argument:

> On September 23[d], the Court took like a snapshot of the situation
> and said, 'The balance of harms appears to be in favor of granting
> the TRO for the Plaintiff.'  But what the Plaintiff has done with that
> TRO since is taken advantage of the situation by issuing many more
> tribal registrations . . . . [T]here were 20 at that the time that we
> stood in front of you a week ago [when the TRO was issued].  And
> we feared that – you know, 20 vehicles is a status quo.
>
> But since then, they have apparently taken advantage of the
> situation.  They have between 400 and 500 members that they could
> be issuing these registrations to. . . . [T]he problem is that the state is
> restrained while the other party is not.  And the other party is free to
> use the Court's order as a sword, not as a shield and to take action to
> change the status quo.

Aplts' App. vol. III, at 79-80 (counsel for Mr. Brownlee at clarification hearing).

The district court did not respond to the argument and simply converted the TRO

it had issued to a preliminary injunction.

Subsequently, the defendants presented the same argument before the

district court when they sought a stay of the preliminary injunction pending

appeal. Once again, the district court did not address the argument and simply

denied the application for stay. This led the defendants to file an application for

stay before this court, which was ultimately granted on November 9, 1999.

Notably, the defendants' argument before this court was, yet again, that the

preliminary injunction altered the status quo because, while it prevented the state

from issuing more citations, "it free[d] the tribe to issue as many tribal tags and

registrations to whomever it wishe[d]." Aplts' App. for Stay at 5 (filed Oct. 18,

1999).

From this review of the proceedings, it is clear that the defendants did

preserve for our consideration the general issue of status quo. But it should be

noted that, on appeal, the defendants present a markedly different status quo

argument, one never raised before the district court – i.e., that the preliminary

injunction disturbed the status quo because, prior to the lawsuit, the "last

uncontested status" between the parties was when the tribe had no motor vehicle

code of its own and willingly complied with the state registration and titling laws. See Visa, 936 F.2d at 1100 n.8 (defining status quo as "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing") (internal quotation marks omitted).

We do not approve of this sudden change of tune by the defendants. Consequently, we do not consider on appeal the defendants' new status quo argument. See Fed. R. Civ. P. 46 (requiring that "a party, at the time the ruling or order of the court is made or sought, make[] known to the [trial] court the action which the party desires the court to take or the party's objection to the action of the court *and* the grounds therefor") (emphasis added); Shultz v. Rice, 809 F.2d 643, 647 (10th Cir. 1986) (noting that a trial court should be "provide[d] . . . with the opportunity to know the specific contentions and to take corrective action, if required"); see also Singleton v. Wulff, 428 U.S. 106, 121 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals."). We limit our review instead to the argument that the defendants made below, that is, that the preliminary injunction changed the status quo because, although it restrained the state from issuing more citations, it did not restrict the tribe from issuing more registrations and titles.

To begin our analysis, we agree with the defendants that the preliminary injunction did not name the tribe as a restricted party. It simply specified that the defendants were restrained from acting – i.e., from "any further application and enforcement of the Kansas motor vehicle registration or titling laws against the [tribe] and any persons who operate or own a vehicle registered and titled under [the] Tribal Code . . . ." Aplts' App. vol. II, at 143 (district court order, filed Oct. 13, 1999). It seems to us, then, that under the terms of the preliminary injunction the tribe was in fact free to increase its registration and titling if it so desired. But while the preliminary injunction permitted the tribe to proceed with more registration and titling, it did not as a necessary consequence *protect* all registration and titling. According to the preliminary injunction, only vehicles "register *ed* and titl *ed*" under the tribal motor vehicle code were protected. The use of the past tense here is significant. It indicates that the preliminary injunction applied only to those tribal registrations and titles already existing as of the time the preliminary injunction was entered. Had the preliminary injunction been intended to include future tribal registrations and titles, it would have read differently. For example: "The defendants are enjoined from applying and enforcing the state registration and titling laws with respect to vehicles

-34-

registered and titled, *or to be registered and titled*, under the tribal motor vehicle code." [5]

Because the preliminary injunction extends only to those tribal registrations and titles already existing prior to its issuance, we reject the defendants' argument that the preliminary injunction disturbed the status quo. Status quo means literally "[t]he situation that currently exists," Black's Law Dictionary 1420 (7th ed. 1999), and at the time the tribe filed suit the situation currently existing was one in which (1) the state motor vehicle code was in force, (2) the tribal motor vehicle code was in force, and (3) approximately twenty tribal registrations and titles were in use. The preliminary injunction issued by the district court in essence "froze" that moment in time, giving (temporary) validity to the tribal registrations and titles already issued but no more. As the defendants themselves recognized, "[T]he Court took like a snapshot of the situation." Aplts' App. vol. III, at 79 (counsel for Mr. Brownlee at clarification hearing); see also Massachusetts Mut. Life Ins. v. Associated Dry Goods Corp., 786 F. Supp. 1403,

_____

[5] Our narrow reading of the preliminary injunction is justified not only because of the language used but also because of this court's authority to modify overbroad injunctions. See United States v. Jenks, 22 F.3d 1513, 1519 (10th Cir. 1994).

1427 (N.D. Ind. 1992) (recognizing that the status quo could but "need not consist of a photographic replication of the circumstances existing at the moment suit was filed"). Because the preliminary injunction issued by the district court did not change the status quo, the district court properly applied the traditional standard rather than the heightened one.

### 3. Preliminary Injunction Merits

Having established that the district court properly used the traditional standard in deciding whether to issue the preliminary injunction, we now proceed to the defendants' merit-based challenge to the injunctive relief. We review for an abuse of discretion. See ACLU, 194 F.3d at 1155. Under this deferential standard of review, we conclude that the district court did not abuse its discretion in analyzing the following four factors: (1) irreparable harm, (2) balancing of potential harms, (3) public interest, and (4) substantial likelihood on the merits.

#### a. Irreparable Harm

The concept of irreparable harm, unfortunately, "does not readily lend itself to definition." Wisconsin Gas Co. v. Federal Energy Regulatory Comm'n, 758 F.2d 669, 674 (D.C. Cir. 1985). Case law has provided some guidance, however,

noting for example that the injury "must be both certain and great," id.; and that it must not be "merely serious or substantial." A.O. Smith Corp. v. FTC, 530 F.2d 515, 525 (3d Cir. 1976). Cases have also noted that irreparable harm is often suffered when "the injury can[not] be adequately atoned for in money," id.; or when "the district court cannot remedy [the injury] following a final determination on the merits." American Hosp. Ass'n v. Harris, 625 F.2d 1328, 1331 (3d Cir. 1980).

Given these definitions, we hold that the district court did not abuse its discretion in determining that, without the preliminary injunction, the tribe would suffer irreparable harm. First, the injury to the tribe was "certain and great" and more than "merely serious or substantial." As noted above, motor vehicle registration and titling is a traditional governmental function. The tribe instituted its motor vehicle code not out of whim but because of a need to "control[] the access and presence of persons to and on [the] Reservation territory," a result of "an increasing number of motor vehicles . . . being used by Indian and non-Indian persons to enter the Reservation territory in order to engage in gaming and other activities with Tribal enterprises or members." PBMVC § 17-1. Thus, the threat of continued citation by the state created the "prospect of significant interference with [tribal] self-government." Seneca-Cayuga, 874 F.2d at 716 (finding

-37-

irreparable injury where threatened loss of revenues and jobs created "prospect of significant interference with [tribal] self-government").

Second, the injury to the tribe was irreparable because it could not be adequately compensated for in the form of monetary damages. Not only is harm to tribal self-government not easily subject to valuation but also, and perhaps more important, monetary relief might not be available to the tribe because of the state's sovereign immunity. See Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Soc. & Rehab. Servs. , 31 F.3d 1536, 1543 (10th Cir. 1994) (noting that "plaintiffs had established harm – a legally cognizable injury to them resulting from noncompliance with the Boren Amendment" and that the "plaintiffs' injury was irreparable" because "the Eleventh Amendment bars a legal remedy in damages"). [6]

---

[6] The defendants seem to suggest that the tribe would not suffer irreparable injury without the preliminary injunction because multiple compliance – i.e., compliance with both the tribal and the state registration and titling laws – is possible. See Aplts' App. vol. III, at 74-75 (counsel for Ms. Pierce and Ms. Walker) ("There is nothing wrong with Kansas plates and Kansas titles on the back of a vehicle, and if they want to put an Indian plate on the front of the vehicle, they're free to do so."). We disagree.

It is not clear, for example, that a vehicle owner can have in her possession two certificates of title, one issued by the tribe and a second issued by the state. See PBMVC § 17-10-19(A)(8) ("Each applicant for a [tribally issued] certificate of title shall surrender to the Registrar . . . any and all other certificate of title

(continued...)

b.  Balancing of Potential Harms

According to the defendants, the district court failed to give adequate consideration to the harm the state would suffer upon issuance of the preliminary injunction.  As framed by the defendants, the injury to the state was largely one of safety:  Vehicles with tribally issued registrations and titles do not appear in the national crime database, and so a law enforcement officer who stops such a vehicle has "no idea if that car is stolen [or] if there are any warrants out on the driver," Aplts' App. vol. III, at 27 (counsel for Ms. Pierce and Ms. Walker); consequently, the lives of law enforcement officers as well as the lives of "the public at large" are placed in danger.     Id. at 86 (counsel for Mr. Brownlee).

While the defendants raise a legitimate concern, we cannot say that the district court abused its discretion in determining that the injury to the tribe was

---

(...continued)
issued by any other governmental agency of any state which is held by the applicant . . . as a prerequisite to receiving a certificate of title from the Prairie Band of Potawatomi . . . .").  Without a certificate of title for each sovereign, the owner could not have her vehicle registered with each sovereign.     See PBMVC § 17-10-4(D) (noting that a certificate of title "is a prerequisite to registration of [a] vehicle"); Kan. Stat. Ann. § 8-135(c) (noting that "[n]o vehicle required to be registered shall be registered . . . unless the applicant for registration shall present satisfactory evidence of ownership and apply for an original certificate of title for such vehicle").

the more substantial. We note first that, given the record, it does not seem an impossible task for the tribe to have its relatively small number of registrations and titles become a part of the national database. The defendants vehemently protest that "the Department of Revenue will not act as the Tribe's data entry clerks for inputting data into our system," Aplts' App. vol. III, at 106 (counsel for Ms. Pierce and Mr. Walker at clarification hearing), but there is no indication in the record that the tribe was prevented from having its own data entry clerk or possibly even its own system to be linked to the national database.

In addition, the record indicates that the defendants might have exaggerated the safety problem. In that respect, we take note of the following: (1) Master Trooper Gary Thiessen of the Kansas Highway Patrol stated outright in an incident report that "this issue was not one of safety, but one of revenue," Aplts' App. vol. III, at 118 (Kansas Highway Patrol Combined Incident Report, dated Aug. 12, 1999); (2) vehicles with tribal registrations and titles were in use for several months without any safety-related incident; (3) Jackson County Attorney Micheal A. Ireland did not seem troubled by the safety issue, voluntarily adopting a policy under which no citations would be issued to the tribe or its members until a meeting could be held, see id., at 110 (affidavit of Mr. Ireland); (4) the safety issue did not appear to worry the state of Minnesota, which granted recognition to

the tribe's registrations and titles; and (5) in spite of its concern about safety, Kansas still recognizes the registrations and titles of tribes residing outside the state. See note 2, supra.

The defendants argue, however, that aside from the safety problem there is another injury to which the district court did not give adequate consideration: interference with state sovereignty. See Aplts' Br. at 26 ("Kansas has a significant and special sovereign interest in regulating and administering its laws on behalf of all of its citizens on the public roads and highways that cross over its territory."). This argument does give us some concern; yet again we cannot say that the district court abused its discretion in finding that, in this limited area, the threatened injury to tribal sovereignty outweighed the potential harm to state sovereignty. Federal Indian law is replete with examples in which state law has had to accommodate tribal sovereignty, whether because of federal preemption or because of the guardian-ward relationship between the federal government and Indian tribes. See Felix S. Cohen, Handbook of Federal Indian Law 234 (1982 ed.) ("[Chief Justice] Marshall said [in Worcester v. Georgia, 31 U.S. 515 (1832)] that the United States had assumed the role of 'protector' of the Indian tribes, acknowledging and guaranteeing their security as distinct political communities in exchange for their friendliness to the United States."). Furthermore, the state has

not been prevented from enforcing its registration and titling laws wholesale – only with respect to the tribe and its members. In contrast, without the preliminary injunction, the tribe's registration and titling would likely have come to an end.

### c. Public Interest

The defendants argue next that the preliminary injunction was adverse to the public interest, largely because of the safety concern discussed above. In response, the tribe asserts that the public has an interest in encouraging tribal self-government and that the tribal motor vehicle laws benefitted the public by "provid[ing] a safe and efficient transportation system [and by] establish[ing] standards for the registration of vehicles [and] the issuance of certificates of title." Aplts' App. vol. III, at 95-96 (counsel for tribe at clarification hearing). The tribe also argues that a denial of the preliminary injunction would have harmed the public because, under the tribal code, if the state did not grant recognition, the tribe "would be required . . . in return to deny recognition to state issued registrations and titles under tribal law." Aplts' App. vol. III, at 15-16 (counsel for tribe at TRO hearing); see also PBMVC § 17-10-5(I) ("A vehicle, even though operated upon roads within the boundaries of this Reservation, is

-42-

exempt for [sic] registration when such vehicle . . . [i]s a motor vehicle currently registered in another Jurisdiction and not required to be registered with the Prairie Band of Potawatomi. This exemption shall apply only to the extent that the other Jurisdiction provides the same privileges and recognition for the tags and titles issued by the Prairie Band Potawatomi Nation.").

We hold that the district court did not abuse its discretion in finding that the public interest would not be adversely impacted by the issuance of the preliminary injunction. As discussed above, the safety issue is not as portentous as the defendants would have it; in addition, this court's case law suggests that tribal self-government may be a matter of public interest. See Seneca-Cayuga, 874 F.2d at 716 ("[T]he injunction promotes the paramount federal policy that Indians develop independent sources of income and strong self-government.").

### d. Substantial Likelihood of Success

Because the tribe established the above three factors to the district court's satisfaction, it was not required to demonstrate a substantial likelihood of success on the merits. Rather, it had only to prove that there were "questions going to the merits . . . so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." FLLC, 195 F.3d at

1194. Again, given our deferential standard of review, we conclude that the district court did not abuse its discretion by finding that this factor was met.

Under Supreme Court case law, federal preemption is one barrier to the assertion of state regulatory authority over a tribe and its members. See White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 142 (1976). In the context of federal Indian law, the issue of preemption typically arises when state law conflicts with (1) an enactment of Congress pursuant to the Indian Commerce Clause or (2) a treaty entered into by the United States and a tribe. See McClanahan v. State Tax Comm'n, 411 U.S. 164, 172 n.7 (1973).

Because of "[t]he unique historical origins of tribal sovereignty[,] . . . it [is] generally unhelpful to apply . . . standards of pre-emption that have emerged in other areas of the law." White Mountain, 448 U.S. at 143. In fact, there are special standards of preemption that apply only to federal Indian law. For example, "in order to find a particular state law to have been preempted by operation of federal law, [there need not be] an express congressional statement to that effect." Id. at 144. Similarly, a treaty need not contain an express statement to have a preemptive effect. See, e.g., McClanahan, 411 U.S. at 174-75 (noting that "[t]he treaty nowhere explicitly states that the Navajos were to be free from state law or exempt from state taxes" but that "this Court has

interpreted the Navajo treaty to preclude extension of state law – including state tax law – to Indians on the Navajo Reservation").  Preemption in the context of federal Indian law is also unique in that it rests "principally on a consideration of the competing interests at stake" – i.e., tribal, federal, and state interests.  New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 334 (1983) [hereinafter New Mexico v. Mescalero] (rejecting "a narrow focus on congressional intent to preempt State law as the sole touchstone").

Another barrier to the exercise of state power is the doctrine of Indian sovereignty.  See White Mountain, 448 U.S. at 142.  Under Supreme Court case law, tribal sovereignty is imposed upon if the exercise of state authority "unlawfully infringe[s] on the right of reservation Indians to make their own laws and be ruled by them."  New Mexico v. Mescalero, 462 U.S. at 334 n.16 (internal quotation marks omitted).  Though modern cases tend to focus more on federal preemption to define the limits of state power, the doctrine of Indian sovereignty has not been weeded out of federal Indian law.  Rather, it provides an essential "backdrop against which the applicable [federal] treaties and statutes must be read."  McClanahan, 411 U.S. at 172; see also id. at 172 n.8 ("The extent of federal pre-emption and residual Indian sovereignty in the *total absence* of federal treaty obligations or legislation is . . . now something of a moot question.  The

question is generally of little more than theoretical importance . . . since in almost all cases federal treaties and statutes define the boundaries of federal and state jurisdiction.") (citations omitted and emphasis added).

In the instant case, there are at least three possible barriers to the state's assertions of authority with respect to motor vehicle registration and titling:  First, the various congressional enactments that demonstrate a congressional concern with fostering tribal self-government might preempt the state laws on registration and titling.  See White Mountain , 448 U.S. at 143 & n. 10 ("[T]his tradition [of Indian sovereignty] is reflected and encouraged in a number of congressional enactments demonstrating a firm federal policy of promoting tribal self-sufficiency and economic development.").  Second, the several treaties between the United States and the tribe,    see 9 Stat. 853 (1846); 12 Stat. 1191 (1861); 15 Stat. 531 (1867);   see also  1867 WL 5410 (executive order), might be a basis for preemption, given that the treaties established the right of the tribe to a reservation and therefore (implicitly) its right to self-govern.        See McClanahan , 411 U.S. at 174-75 ("[I]t cannot be doubted that the reservation of certain lands for the exclusive use and occupancy of the Navajos and the exclusion of non-Navajos from the prescribed area was meant to establish the lands as within the exclusive sovereignty of the Navajos under general federal supervision.").

Finally, the doctrine of Indian sovereignty might act as a bar to state regulatory authority, though as noted above this doctrine typically works in tandem with federal preemption instead of as an independent barrier. [7]

The defendants argue, however, that the congressional enactments, the treaties, and the doctrine of Indian sovereignty only support preemption of state laws *on* the reservation; they say nothing about the force of state laws *beyond* the reservation but still within the state. According to the defendants, Mescalero Apache Tribe v. Jones, 411 U.S. 145 (1973) [hereinafter Mescalero], establishes

_____

[7] In its brief, the tribe raises another possible barrier: the Kansas Admission Act. See Kansas Admission Act § 1, 12 Stat. 126, 127 (1861) ("[N]othing contained in the said constitution respecting the boundary of said State shall be construed to impair the rights of person or property now pertaining to the Indians in said Territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians, or to include any territory which, by treaty with such Indian tribe, is not . . . to be included within the territorial limits or jurisdiction of any State or Territory . . . .").

For purposes of this opinion, we need not address this argument, though the tribe is certainly entitled to present it for consideration in subsequent proceedings before the district court. We do point out, however, that this court recently issued an opinion on the meaning of the Act. See generally Sac & Fox Nation of Mo. v. Pierce, 213 F.3d 566 (10th Cir. 2000), cert. denied, 121 S. Ct. 1078 (2001). This court suggested in Sac & Fox that an Indian tribe could not assert rights under the Act unless the tribe had a treaty with the United States that reserved those rights to the tribe at the time the Act went into effect. See id. at 577 ("The Act for Admission excludes from the boundaries of the State of Kansas only those lands which Indian tribes reserved unto themselves 'by treaty' with the United States.").

-47-

the power of the state once vehicles with tribal registrations and titles are taken outside the reservation. They cite the following general principle espoused in Mescalero : "Absent express federal law to the contrary, Indians going beyond reservation boundaries have *generally* been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State." Id. at 148-49 (emphasis added).

Mescalero is undoubtedly an important decision to be considered in the resolution of the case at hand, especially since Congress did not explicitly provide that states must grant recognition to tribal registration and titling. However, at this point, our concern is not the final merits but rather whether there are "questions going to the merits . . . so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." FLLC, 195 F.3d at 1195. We believe that there are. While Mescalero provides support for the defendants' position, we question whether it can be applied in as broad strokes as the defendants have used, that is, without taking into consideration the specific facts that animated the case. [8] We reiterate

---

[8] The Supreme Court did state that the Mescalero principle "is as relevant to a State's tax laws as it is to state criminal laws, and applies as much to tribal resorts as it does to fishing enterprises." Mescalero, 411 U.S. at 149. We do not take this statement to mean, however, that the facts in Mescalero are not worthy of any consideration in

(continued...)

-48-

that preemption in the context of federal Indian law is about the careful balancing of tribal, federal, and state interests. Depending on the facts, the interests of these three sovereigns may vary. [9]

We note, for example, that the tribal activity in Mescalero – the operation of a ski resort located outside reservation land – was conducted clearly and exclusively beyond the reservation, thus heightening the interests of the state. The same, however, cannot be said of the activity in the instant case: Here, the activity conducted by the tribe was the registration and titling of vehicles; this activity occurred within the reservation, not beyond, although as an ancillary consequence driving outside the reservation did occur. [10] See Blue Lake Forest

_____

(...continued)
*understanding* the principle.

[9] We disagree with the Ninth Circuit's conclusion that, under Mescalero, no balancing of interests takes place once the tribal activity takes place off-reservation. See Cabazon Band of Mission Indians v. Smith, No. 99-55229, 2001 WL 521436, at *2 (9th Cir. May 17, 2001) [hereinafter Cabazon II] ("White Mountain's preemption analysis is not applicable to off-reservation activity."). Rather, we believe that the dissent in Cabazon II had the better of it. See id. at *8 (Browning, J., dissenting) (noting that the Mescalero principle "was only a generality and not carved in stone on Mt. Sinai"; also noting that the Supreme Court has not restricted the balancing-of-interests test to cases in which the tribal activity is solely on-reservation). That is, we read Mescalero to say that, if the tribal activity is off-reservation that fact *generally* tips the balancing test in favor of the state (assuming there is no express federal law to the contrary).

(continued...)

Prods., Inc. v. Hong Kong & Shanghai Banking Corp., Ltd. , 30 F.3d 1138, 1141 (9th Cir. 1994) ("Even though this case implicates an off-reservation relationship between two non-Indian actors (Blue Lake and the bank), we deem it an on-reservation case for purposes of preemption because the essential conduct at issue occurred on the reservation: the severance of timber and its removal without proper compensation, in contravention of the governing contract and federal regulations. Furthermore, the Indian enterprise at the heart of this dispute – the timbering lands – is located on, not off, the reservation."); People v. McCovey , 685 P.2d 687, 697 (Cal. 1984) (en banc) (distinguishing Mescalero in part because "the Indian activity in [ Mescalero ] occurred entirely off the reservation, while this case involves on-reservation fishing followed by an off-reservation sale").

Furthermore, the activity in Mescalero is in no way comparable to the activity in the instant case because the operation of a ski resort is not a traditional governmental function whereas the registration and titling of motor vehicles is.

_____

(...continued)
[10] Of course, these off-reservation effects should still be taken into account when it comes to the interests of the state. See, e.g. , New Mexico v. Mescalero , 462 U.S. at 336 (1983) ("A State's regulatory interest will be particularly substantial if the State can point to off-reservation effects that necessitate State intervention.").

Because of this fact, the interests of the tribe are heightened, a significant counter to the state's interests in the effects of off-reservation driving. Which sovereign's interests are more important is not at this point a matter appropriate for our consideration. Instead, we merely note that Mescalero's distinction between on- and off-reservation activities is not necessarily dispositive, especially in light of the doctrine of Indian sovereignty. As the Supreme Court has repeatedly explained, the powers of tribes extend over not only their territory but also their members, see Atkinson Trading Co., Inc. v. Shirley, 121 S. Ct. ---, --- (2001) ("Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory . . . .") (internal quotation marks omitted)[11]; therefore, "[u]nder some circumstances tribal powers can extend over members going *beyond* reservation boundaries." Cohen, supra, at 246 (emphasis added). "The determinative factor is whether the matter falls within the ambit of internal self-government." Id.; John v. Baker, 982 P.2d 738, 752 (Alaska 1999) ("[I]n determining whether tribes retain their sovereign powers, the United States

---

[11] We have taken into consideration the Supreme Court's recent holding in Atkinson and conclude that it does not affect the case at hand for at least two reasons: (1) Atkinson deals with the application of Montana v. United States, 450 U.S. 544 (1981), while our concern here is the application of Mescalero, and (2) Atkinson deals with tribal authority over nonmembers, whereas here our focus is tribal authority over members.

Supreme Court looks to the character of the power that the tribe seeks to exercise, not merely the location of events."), cert. denied , 528 U.S. 1182 (2000). As one district court summed up, "The extent of tribal sovereignty . . . clearly involves more than simple geographic limits, but includes the 'tradition of Indian sovereignty over the reservation and tribal members.' Certain aspects of tribal sovereignty, such as tribal immunity from suit, have been held to be so fundamental as to preempt the enforcement in court of state laws regardless of where the activity takes place." Cabazon Band of Mission Indians v. Smith , 34 F. Supp. 2d 1201, 1207 (C.D. Cal. 1998) (quoting White Mountain , 448 U.S. at 143) , aff'd , Cabazon II , 2001 WL 521436. But see id. at *2 (criticizing the district court for making this statement based on its conclusion that Mescalero , not White Mountain , was controlling since the tribal activity at issue was off-reservation).

From this brief analysis of Mescalero , it should be clear that there are indeed "questions going to the merits . . . so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." [12] FLLC , 195 F.3d at 1195. And we note that Mescalero is only

_____

[12] We do not even address whether Mescalero's general principle is applicable in the first place given that arguably the application of the state motor vehicle laws was *not* nondiscriminatory. See Cabazon II, 2001 WL 521436, at *9 (Browning, J., dissenting) (noting that the application of the state motor vehicle laws was in fact discriminatory

(continued...)

the tip of the iceberg.  As the parties have pointed out, Red Lake and Queets are two more cases to take into consideration as, in each of these cases, a state was compelled to extend recognition to motor vehicle registrations issued by a tribe. See generally Red Lake , 248 N.W.2d at 722; Queets , 765 F.2d at 1399.  In addition, the parties should take into account the federal Indian law taxation cases, in particular, Oklahoma Tax Commission and Colville , as in both of these cases the Supreme Court indicated that tribal members could be compelled to pay state motor vehicle registration fees (i.e., taxes) if the fees were tailored to off-reservation use (i.e., use of the state roads). See Oklahoma Tax Comm'n , 508 U.S. at 127-28; Colville , 447 U.S. at 162-64.  Further examination of Oklahoma Tax Commission and Colville is certainly warranted, though their relevance may be limited because the focus of the state's interests in those cases was revenue and not safety (the primary concern of the defendants in the instant case).  We also note that titling was not at issue in either Oklahoma Tax Commission or Colville , while it is contested in the case at hand.

---

(...continued)
because (1) the tribe was similarly situated to states outside California but received different treatment and because (2) the state laws made an exception for one tribe but not the plaintiff-tribe).

## IV. CONCLUSION

We conclude that the district court did have jurisdiction over the instant case and that it did not abuse its discretion in granting the preliminary injunction. Under the preliminary injunction, the defendants were enjoined from issuing more citations but only with regard to those tribal registrations and titles already issued prior to the grant of the preliminary injunction. Accordingly, we AFFIRM.