**F I L E D**

**PUBLISH**

**February 6, 2007**

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

---

PRAIRIE BAND POTAWATOMI
NATION,

    Plaintiff-Appellee,

v.

JOAN WAGNON, Secretary of
Revenue, State of Kansas, in her
official capacity; SHEILA WALKER,
Director of Vehicles, State of Kansas,
in her official capacity; WILLIAM
SECK, Superintendent, Kansas
Highway Patrol, State of Kansas, in
his official capacity,

    Defendants-Appellants.

No. 03-3322

(D.C. No. 99-CV-4136-JAR)

(D. Kansas)

---

**OPINION ON REMAND FROM THE**
**UNITED STATES SUPREME COURT**

---

John Michael Hale, Special Assistant Attorney General, Legal Services Bureau,
Kansas Department of Revenue, Topeka, Kansas, for Defendants-Appellants.

David Prager, III, Tribal Attorney, Prairie Band Potawatomi Nation, Mayetta,
Kansas, for Plaintiff-Appellee.

---

Before **McCONNELL** and **McKAY**, Circuit Judges, and **FRIOT**, District Judge.[*]

---

[*] The Honorable Stephen P. Friot, United States District Judge for the
Western District of Oklahoma, sitting by designation.

**McKAY**, Circuit Judge.

Plaintiff Prairie Band Potawatomi Nation (the "Nation"), a federally recognized Kansas Indian tribe, originally filed this action against Kansas state officials to obtain a court order requiring that the State recognize motor vehicle registrations and titles issued by the Nation. The district court granted a preliminary injunction in favor of Plaintiff, affirmed by this court on June 25, 2001, prohibiting enforcement of the State motor vehicle registration and titling laws with respect to vehicles registered and titled by the Nation. *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234 (10th Cir. 2001) ("*Prairie Band I*"). On August 6, 2003, following the outline and guidance provided by this court in *Prairie Band I*, the district court granted Plaintiff's motion for summary judgment, permanently enjoining Defendants from further application and enforcement of Kansas' motor vehicle and titling laws against Plaintiff and any persons who operate or own a vehicle properly registered and titled pursuant to tribal law. On October 8, 2003, the district court denied Defendants' motion to reconsider, and this court subsequently affirmed the district court's grant of summary judgment in favor of Plaintiff and its issuance of the permanent injunction. *Prairie Band Potawatomi Nation v. Wagnon*, 402 F.3d 1015 (10th Cir. 2005) ("*Prairie Band II*"), *vacated* ---U.S.---, 126 S. Ct. 826 (2005) (mem.).

Defendants appealed to the Supreme Court, which vacated the judgment

-2-

and remanded for reconsideration in light of the Court's decision in *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 126 S. Ct. 676 (2005) ("*Prairie Band III*"). We revisit our decision, paying heed to the Supreme Court's caution regarding the applicable scope of the interest-balancing test promulgated in *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980).

The district court's opinions and our opinion in *Prairie Band I* provide a comprehensive history of the dispute, which therefore need not be repeated in detail here. The relevant facts follow. On March 16, 1999, in order to address the increase in motor vehicle traffic on the reservation, the Nation enacted the Prairie Band Motor Vehicle Code ("PBMVC") to "implement reasonable rules, regulations, and penalties essential to maintaining a safe and efficient transportation system" on its reservation.[1] (Appellee's Supp. App., vol. I, at 8 (PBMVC ch. 17-1, § 17-1).) Pursuant to the PBMVC, tribal registrations and titles are required for all vehicles owned by Tribe members who reside on the reservation and for all tribal government vehicles. (*Id.* at 56 (PBMVC ch. 17-10, § 17-10-1(B).) The PBMVC requires those seeking tribal registrations to

---

[1] Section 17-10-1 of the PBMVC notes that "[a]n increasing number of tribal members are seeking to reside on the Reservation, and an increasing number of motor vehicles are being used by Indian and non-Indian persons to enter the Reservation territory in order to engage in gaming and other activities with Tribal enterprises or members." (Appellee's Supp. App., vol. I, at 55 (PBMVC ch. 17-10, § 17-10-1(A)).) The motor vehicle registration and titling section "is necessary in order for the Tribe to be able to control and regulate [this] ever-increasing amount of motor vehicle traffic on the Reservation." (*Id.*)

surrender any certificate of title issued by another jurisdiction, including Kansas. (*Id.* at 70, PBMVC ch. 17-10, § 17-10-19(A)(8).) The tribal certificates of title are of banknote quality and resemble titles of other jurisdictions, and the license plates conform to the national standards for visibility, design, and size. (*Id.* at 80.)

Prior to the enactment of the PBMVC, the Nation's members complied with Kansas' motor vehicle code, which requires that all vehicles operating in Kansas be registered and titled by the State. *See* Kan. Stat. Ann. § 8-142.[2] Nonresidents

_____

[2] Section 8-142 provides in pertinent part:

It shall be unlawful for any person to commit any of the following acts and except as otherwise provided, violation is subject to penalties provided in K.S.A. 8-149, and amendments thereto:

*First:* To operate, or for the owner thereof knowingly to permit the operation, upon a highway of any vehicle, as defined in K.S.A. 8-126, and amendments thereto, which is not registered, or for which a certificate of title has not been issued or which does not have attached thereto and displayed thereon the license plate or plates assigned thereto by the division for the current registration year, including any registration decal required to be affixed to any such license plate pursuant to K.S.A. 8-134, and amendments thereto, subject to the exemptions allowed in K.S.A. 8-135, 8-198 and 8-1751a, and amendments thereto.

*Second:* To display or cause or permit to be displayed, or to have in possession, any registration receipt, certificate of title, registration license plate, registration decal, accessible parking placard or accessible parking identification card knowing the same to be fictitious or to have been canceled, revoked, suspended or altered.

(continued...)

operating vehicles in Kansas are not considered in violation of Kansas law if they are properly registered and titled in the state of their residence, provided that their state grants reciprocal recognition to Kansas' registrations and titles. *See* Kan. Stat. Ann. § 8-138a.[3]

It is Defendants' position that, in absence of an injunction, drivers of tribally licensed vehicles will be in violation of Kansas state law for failure to present a properly registered vehicle. According to Defendants, since the Nation is within the State of Kansas, the reciprocal-privileges exception of § 8-138a does not apply to the Nation because its members are residents of Kansas. As a result of this policy decision, prior to this litigation and the issuance of the preliminary injunction three citations and a warning ticket were issued by State law

---

[2](...continued)
Kan. Stat. Ann. § 8-142.

[3] Section 8-138a states:

> The provisions of this section shall apply only to the nonresident owner or owners of any motor vehicle constructed and operated primarily for the transportation of the driver or the driver and one or more nonpaying passengers. Such nonresident owners, when duly licensed in the state of residence, are hereby granted the privilege of operation of any such vehicle within this state to the extent that reciprocal privileges are granted to residents of this state by the state of residence of such nonresident owner.

Kan. Stat. Ann. § 8-138a. As we noted in *Prairie Band I*, the Kansas Supreme Court interpreted § 8-138a to require recognition of registrations and titles issued by Indian tribes that reside outside the State of Kansas. *See State v. Wakole*, 959 P.2d 882, 885-86 (Kan. 1998).

enforcement to tribal members, pursuant to Kan Stat. Ann. § 8-142, for driving tribally registered vehicles off the reservation. Plaintiff submits that it is necessary for privately and tribally owned vehicles to occasionally leave the reservation not only for individual purposes, but also in the exercise of tribal government functions.[4]

Because our decision in *Prairie Band II* was vacated in its entirety, we must readdress each issue raised by Defendants on appeal. As succinctly stated in our prior opinion, the issues on appeal are whether the district court: (1) abused its discretion in issuing the permanent injunction; (2) erred in its ruling that Defendants were not entitled to sovereign immunity; and (3) erred in ruling that the relief requested by the Nation (a permanent injunction) did not violate the Tenth Amendment.

We review *de novo* a district court's grant of summary judgment, applying the same legal standard employed by the district court, to determine whether there is a genuine issue as to any material fact and whether a party is entitled to judgment as a matter of law. *Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1111 (10th Cir. 2006); *Sac & Fox Nation of Mo. v. Pierce*, 213 F.3d 566, 583 (10th Cir. 2000). The first issue on appeal is whether the district court abused its discretion

---

[4]As of July 2002, there were three vehicles in use that had been issued tribal registrations and titles. The Nation expects to register and title approximately 300-400 vehicles in accordance with the PBMVC if the Nation's regulatory authority is affirmed.

in issuing the permanent injunction. *SEC v. Pros Int'l, Inc.*, 994 F.2d 767, 769 (10th Cir. 1993) ("[W]e review the district court's grant or denial of a permanent injunction for an abuse of discretion."). A district court abuses its discretion when it issues an "arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *Coletti v. Cudd Pressure Control*, 165 F.3d 767, 777 (10th Cir. 1999) (internal quotation omitted).

For a party to obtain a permanent injunction, it must prove: "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1180 (10th Cir. 2003). This standard is remarkably similar to the standard for a preliminary injunction. The only measurable difference between the two is that a permanent injunction requires showing actual success on the merits, whereas a preliminary injunction requires showing a substantial likelihood of success on the merits. *See Prairie Band I*, 253 F.3d at 1246 (citing *Fed. Lands Legal Consortium v. United States*, 195 F.3d 1190, 1194 (10th Cir. 1999)). Given our determination in *Prairie Band I* that the Nation will suffer irreparable harm if the injunction is not issued, that the balance of the harms favors the Tribe, and that the granting of the injunction will not adversely affect the public interest, it follows that the only real controversy that this Court must decide is whether the district court abused its

discretion in ruling that the Nation has succeeded on the merits.[5]

Plaintiff originally argued during the summary judgment appeal that, pursuant to the law of the case doctrine, our decision in *Prairie Band I* negated the need to revisit certain issues. According to Plaintiff, these issues included: (1) subject matter jurisdiction; (2) standing; (3) presence of an Article III case or controversy; and (4) use of the *Bracker* balancing test. As an initial matter, the first three issues were resolved by this court in favor of Plaintiff in *Prairie Band I*, 253 F.3d at 1239-43, and Defendants do not persist in questioning our resolution of those issues.[6] As to the final issue, Plaintiff's supplemental briefing following remand reflects that the law of the case doctrine is no longer able to justify using *Bracker*. Nevertheless, we address this issue more fully here given our repeated reliance on the *Bracker* interest balancing test in our previous decisions, which have been called into question in light of the Supreme Court's instruction on remand. Although the law of the case doctrine provides that where "a court decides upon a rule of law, that decision should continue to govern the

---

[5] Defendants make a bald claim on appeal that the second, third, and fourth permanent injunction factors were applied incorrectly by the district court (Appellants' Br. at 8), but provide no argument in support of this assertion. We will not craft a party's argument for him on appeal. *See United States v. Graham*, 305 F.3d 1094, 1107 (10th Cir. 2002); *Perry v. Woodward*, 199 F.3d 1126, 1141 n.13 (10th Cir. 1999); *Brownlee v. Lear Siegler Mgmt. Servs. Corp.*, 15 F.3d 976, 977-78 (10th Cir. 1994); *Am. Airlines v. Christensen*, 967 F.2d 410, 415 n.8 (10th Cir. 1992); *Primas v. City of Okla. City*, 958 F.2d 1506, 1511 (10th Cir. 1992).

[6] Defendants do, however, make a misconceived Eleventh Amendment sovereign immunity argument on appeal, which is addressed in detail below.

same issues in subsequent stages in the same case," *Arizona v. California*, 460 U.S. 605, 618 (1983), the rule is a flexible one that allows courts to depart from erroneous prior rulings, as the underlying policy of the rule is one of efficiency, *Major v. Benton*, 647 F.2d 110, 112 (10th Cir. 1981), not restraint of judicial power, *Messinger v. Anderson*, 225 U.S. 436, 444 (1912); *see also Wilson v. Meeks*, 98 F.3d 1247, 1250 (10th Cir. 1996) (citing *Arizona*, 460 U.S. at 618-19). The presence of subsequent contradictory precedent is a legitimate basis for not applying the law of the case doctrine. *Major*, 647 F.2d at 112; *see also Wilson*, 98 F.3d at 1250 (listing limited reasons justifying departure from law of case doctrine, including where "controlling authority has since made a contrary decision of the law applicable to such issues" (quoting *United States v. Monsisvais*, 946 F.2d 114, 117 (10th Cir. 1991) (in turn quoting *White v. Murtha*, 377 F.2d 428, 432 (5th Cir. 1967))). The Supreme Court began its decision in *Prairie Band III* by clarifying that "the *Bracker* interest-balancing test applies only where 'a State asserts authority over the conduct of non-Indians engaging in activity on the reservation.'" 126 S. Ct. at 680 (quoting *Bracker*, 448 U.S. at 144). The Supreme Court's decision in *Prairie Band III* therefore compels our departure from reapplication of the *Bracker* interest balancing test.

The conduct of non-Indians, whether on- or off-reservation, is not at issue here. Nor does this case merely concern the conduct of Indians off-reservation. The fact that motor vehicle titling and registration is a traditional government

function, *see Prairie Band I*, 253 F.3d at 1250; *see also Queets Band of Indians v. Washington*, 765 F.2d 1399, 1403 (9th Cir. 1985) ("Indian tribes possess the sovereign authority to license and register tribal vehicles."), *vacated as moot*, 783 F.2d 154 (9th Cir. 1986)[7]; *accord Red Lake Band of Chippewa Indians v. State*, 248 N.W.2d 722, 725 (Minn. 1976) (finding motor vehicle registration ordinance "an appropriate exercise of governmental authority vested in the Tribal Council of the Red Lake Band"), makes clear that the issue does not concern the location of any individual vehicle or residency of any individual driver, but the sovereign right to make equally enforceable and equally respected regulations in an arena free of discrimination. *Cf. Cabazon Band of Mission Indians v. Smith*, 388 F.3d 691, 699 (9th Cir. 2004) (finding proper comparison for assessing discriminatory application of emergency light bar regulation was between law enforcement agencies). Accordingly, we must no longer concern ourselves with the severity of the effect of the State's regulation on the Nation's sovereign interests, but determine whether the State's law discriminates against the Nation's right to make such regulations vis-a-vis other sovereigns.[8] *See Mescalero Apache Tribe v.*

[7] The Ninth Circuit's decision was withdrawn at the request of the parties in anticipation of legislation that would render the controversy moot. However, the reasoning remains persuasive.

[8] At oral argument, the parties stated that the record was sufficiently developed for this court to make a discrimination determination under our plenary standard of review without need to remand to the district court for further factual development of the record. (Oral Arg. Tr. May 9, 2006.)

*Jones*, 411 U.S. 145, 148-49 (1973).

The Nation, like any governmental entity, has a significant interest in regulating motor vehicles traveling on its land, and "[w]e have no cause to believe that the tribes have been implicitly divested of that power by virtue of their dependent status."[9] *Queets Band*, 765 F.2d at 1403. The Nation has attempted to regulate the effects of increased motor vehicle traffic on its reservation through the PBMVC and through the issuance of tribal registrations and titles. The PBMVC is a comprehensive code that applies to all vehicles that are driven on the reservation. The stated purposes of the PBMVC are: (1) "to

---

[9] The Nation's interest in this case is linked with strong federal interests in promoting strong tribal economic development, self-sufficiency, and self-governance. *See, e.g.*, *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 14 (1987) (stating that Supreme Court has "repeatedly recognized the Federal Government's longstanding policy of encouraging tribal self-government"). These federal interests are reflected in various Acts of Congress, Executive Branch policies, and judicial opinions. *See generally* Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721 (2000); Indian Reorganization Act of 1934, 25 U.S.C. §§ 461-479 (2000); Indian Self-Determination and Education Assistance Act of 1975, 25 U.S.C. § 450 (2000); *see also* Presidential Proclamation 7500, 66 Fed. Reg. 57641 (Nov. 12, 2001) ("We will protect and honor tribal sovereignty and help to stimulate economic development in reservation communities."); Exec. Order 13175, 65 Fed. Reg. 67249 (Nov. 6, 2000) ("[We] recognize[] the right of Indian tribes to self-government and support[] tribal sovereignty and self-determination."); *Bracker*, 448 U.S. at 143 (there is "a firm federal policy of promoting tribal self-sufficiency and economic development"); *Washington v. Confederated Tribes of Colville*, 447 U.S. 134, 155 (1980) (noting that federal statutes evidence "varying degrees [of] congressional concern with fostering tribal self-government and economic development"). "Here, the tribal interests are an outgrowth of the federal policy toward self-determination, self-sufficiency and self-government." *Queets Band*, 765 F.2d at 1407 n.6.

-11-

control and regulate" reservation traffic; (2) "to provide for the orderly registration and licensing of vehicles"; (3) "to assist law enforcement in identifying the owners of such vehicles"; (4) "to prevent fraudulent transfers, theft, conversion, or other wrongful transactions or use of vehicles"; (5) "to provide positive identification of vehicles . . . in cases of emergency"; (6) "to provide revenue to the Nation"; and (7) "to allow for the orderly transfer of title and other commercial transactions." (Appellee's Supp. App., vol. I, at 55-56 (PBMVC Ch. 17-10, § 17-10-1(A)).)

No one disputes the Nation's authority to apply the PBMVC on reservation land; the dispute arises solely because the tribally tagged vehicles must sometimes leave the reservation and drive on Kansas' roads[10] and because the tribal and State motor vehicle registration and titling regulations cannot coexist.[11]

---

[10] There is evidence that the tribal government vehicles leave the reservation on official tribal government business. (Appellee's Supp. App., vol. I, at 81 ¶ 4, 82 ¶ 6.) For instance, tribal law enforcement and tribal emergency medical services vehicles respond to off-reservation traffic accidents, tribal fire department vehicles are used to respond to off-reservation fires, and tribal road equipment vehicles are used to maintain, grade, and remove snow from off-reservation roads. (Appellants' Am. App., vol. IV, at 990-91.) We see no reason to differentiate between these vehicles and those owned by individual tribal members who must leave the reservation to perform essential personal functions not capable of being carried out on-reservation.

[11] In *Prairie Band II*, we observed that Defendants' continued enforcement of the State motor vehicle and titling laws to the exclusion of tribal motor vehicle registration and titling would render the Nation's regulations "'effectively defunct.'" 402 F.3d at 1024 (quoting Appellants' Am. App., vol. IV, at 1026 (District Court Opinion Aug. 6, 2003)); *see also Queets Band*, 765 F.2d at 1409;

(continued...)

Ignoring the fact that the Nation will be forced to rescind its regulation in order to avoid regulating its members into violating State law, it is apparent to this court that simultaneous application of these two regulations is not possible. As a practical matter, vehicles cannot display multiple license plates. At an early stage of the proceedings, Defendants contended that tribal vehicles could bear Kansas license plates on the rear of the vehicle and tribal license plates on the front of the vehicle. *See Prairie Band I*, 253 F.3d at 1251 n.6. This resolution strikes the court as disingenuous and is wholly unsupported by the record. The confusion such a practice would cause in vehicle identification alone renders it unworkable.

Nor can a vehicle have more than one official title. Dual certificates of title would stifle the PBMVC's stated purposes of "provid[ing] for the orderly registration and licensing of vehicles," "prevent[ing] fraudulent transfers, theft, conversion, or other wrongful transactions," and "allow[ing] for the orderly transfer of title and other commercial transactions." (Appellee's Supp. App., vol. I, at 55-56 (PBMVC ch. 17-10, § 17-10-1(A)).) In addition, the PBMVC does not allow for concurrent registration: "Each applicant for a [tribally issued] certificate of title shall surrender to the Registrar . . . any and all other certificate of title issued by any other governmental agency of any state." (Appellee's Supp.

_____

[11](...continued)
*Red Lake Band*, 248 N.W.2d at 727-28. Defendants' comments disparaging the tribal governmental interests are inappropriate, unfounded, and made in obvious ignorance of the nature of the issue before this court.

App., vol. I, at 70 (PBMVC ch. 17-10, § 17-10-19(A)(8)).)  It also does not appear that the Kansas motor vehicle statutes permit multiple registrations.  *See* Kan. Ann. Stat. § 8-135 (referring to "original certificate of title").

In order to circumvent the unique problem posed by these incompatible concurrent regulations, Defendants assert that, once the tribally registered vehicles leave the reservation, Kansas can choose not to recognize these vehicles as validly registered and titled under State law, and that to find otherwise would "subject[] States to the exercise of a tribe's powers."  (Appellants' Supp. Br. at 12-13.)  We disagree.  Such an absolute position ignores the fact that Kansas laws must still be nondiscriminatory under *Mescalero*.  Under Kansas law, residents of other states, territories, or possessions of the United States, the District of Columbia, the Commonwealth of Puerto Rico, foreign countries, and states or provinces of foreign countries are permitted to drive their vehicles on Kansas roads without registering or titling their vehicles in Kansas so long as their vehicles are "duly licensed" in their own state of residence and that jurisdiction grants Kansas-registered vehicles reciprocal privileges.  *See* Kan. Ann. Stat. § 8-138a.  With the exception of Iran and possibly Cuba, "out of the universe of non-Kansas vehicles that appear on Kansas highways, the State recognizes and is willing to accept registration and titling by" practically every jurisdiction "except in the case of Kansas-based Indian tribes." *Prairie Band II*, 402 F.3d at 1030 (McConnell, J., concurring); (*see* Oral Arg. Tr. May 9, 2006).  Indeed, pursuant to

-14-

*State v. Wakole*, the State had to grant reciprocity to Oklahoma tribal-registered vehicles where Oklahoma recognized the tribal registrations. 959 P.2d at 883.

The parties spend a great deal of time on the issue of residency in relation to tribal members. We note that the law leaves their status unclear where, as here, the Nation has exercised its sovereign rights in creating a concurrent law.[12] Regardless, we have already explained that because the right to make motor vehicle titling and registration regulations is a traditional government function, the discriminatory effect is to be analyzed between sovereigns, not individual drivers. As a consequence, Defendants' argument that the Nation and its members are residents of Kansas and, therefore, cannot invoke the reciprocity statute falls flat.

The sole reason offered by Defendants to justify their refusal to recognize the Nation's registration and titling law is that of public safety. *See Prairie Band II*, 402 F.3d at 1024 (citing Oral Arg. Tr. Sept. 29, 2004); *Prairie Band I*, 253

---

[12] In *Iowa Mutual Insurance Co. v. LaPlante*, 480 U.S. 9, 18 n.10 (1987), the Supreme Court noted:

> In 1924, Congress declared that all Indians born in the United States are United States citizens, see Act of June 2, 1924, ch. 233, 43 Stat. 253, now codified at 8 U.S.C. § 1401, and, therefore, under the Fourteenth Amendment, Indians are citizens of the States in which they reside. *There is no indication that this grant of citizenship was intended to affect federal protection of tribal self-government.*

(Emphasis added).

F.3d at 1251. Indeed, Defendants conceded at two separate oral arguments that revenue was not at issue; the sole concern was that of safety and protection of a state's police powers. (*See* Oral Arg. Tr. Sept. 29, 2004 & Oral Arg. Tr. May 9, 2006.) Defendants make much of the fact that the Nation's tribal vehicle registrations do not appear in the national criminal database, thereby endangering the lives of law enforcement personnel by preventing them from obtaining crucial vehicle information. *See Prairie Band I*, 253 F.3d at 1251 (recounting arguments). Judge McConnell, in his well-reasoned concurrence in *Prairie Band II*, questioned whether Kansas refused to recognize registrations from other jurisdictions not linked to the same database. *Prairie Band II*, 402 F.3d at 1030 (McConnell, J., concurring). The answer to that question is no. The record reveals that Oklahoma tribal registrations—recognized by Kansas—are not included in the database. (Appellants' Am. App., vol. IV, at 849-50, 868-69.) As Judge McConnell stated: "If nonparticipation in the database is a genuine problem, Kansas could amend its reciprocity statute to recognize only those non-resident registrations that are included in the database, or meet other non-discriminatory public safety criteria."[13] *Prairie Band II*, 402 F.3d at 1030

---

[13] Defendants have repeatedly and vehemently protested that they will not act as the Nation's data entry clerks to input data into the database system. *Prairie Band I*, 253 F.3d at 1251; (Oral Arg. Tr. May 9, 2006)). However, the Nation made clear that it would take whatever steps necessary to list its registration information on the appropriate database; it never requested that the

(continued...)

(McConnell, J., concurring). Moreover, although safety is a legitimate concern, we previously commented that Defendants had "exaggerated" the severity of that concern here. *See Prairie Band I*, 253 F.3d at 1251. Kansas recognizes license plates from other states, Canada, and Mexico, and tribally issued tags from other jurisdictions, including Minnesota and Oklahoma, without any record-supported safety concerns. In addition, Minnesota has signed a reciprocity agreement with the Nation, indicating a lack of concern over safety on the part of the Minnesota government. (Appellants' Am. App., vol. IV, at 982-87.) Defendants have introduced no evidence indicating that a contrary result is warranted.

The fact that the Supreme Court, in *Prairie Band III*, found that the Nation was not similarly situated to other sovereigns in relation to motor fuel taxation is of no moment. First, this is not a tax case where, "[w]hen two sovereigns have legitimate authority to tax the same transaction, exercise of that authority by one sovereign does not oust the jurisdiction of the other." *Colville*, 447 U.S. at 184 n.9 (Rehnquist, J., concurring in part, concurring in result in part, and dissenting in part). As we have detailed, the two regulations at issue here cannot coexist, and allowing Kansas to effectively eviscerate the Nation's regulation would clearly oust the Nation's jurisdiction; however, the Nation's regulation does not

[13](...continued)
State take on this burden. (Appellee's Supp. App., vol. I, at 83-84 ¶¶ 8.A-B; Oral Arg. Tr. May 9, 2006.)

oust Kansas of jurisdiction any more than do the regulations of any other sovereign.

Second, while the Supreme Court rested its determination on the use of the fuel tax proceeds, here there is no evidence in the record regarding use of titling and registration proceeds that could serve as any point of distinction between the Nation and other sovereigns. Indeed, both sides have disclaimed the relevance of revenue to this issue. Moreover, the fact that the Nation's regulation cannot coexist with the State's regulation renders any assessment of the burdens impossible.

Consequently, we hold that Kansas, by recognizing vehicle registrations from other jurisdictions without concern for safety standards but refusing to recognize vehicles registered by Plaintiff due to alleged safety concerns, impermissibly discriminates against similarly situated sovereigns. The limited regulatory power at issue in this case represents an undeniable incident of tribal sovereignty that the State has effectively undermined through its discriminatory treatment.

The next issue is whether the district court erred in its ruling that Defendants were not entitled to sovereign immunity. The Eleventh Amendment grants states sovereign immunity from suits brought in federal court by their own

citizens, by citizens of other states, by foreign sovereigns, and by Indian tribes.[14]

*Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 779-80 (1991). Defendants

argue that the district court's issuance of a permanent injunction against them

violates the Eleventh Amendment of the United States Constitution because the

Tribe is effectively suing the state.

The Supreme Court carved out an exception to state sovereign immunity in

*Ex parte Young*, 209 U.S. 123 (1908),

> based in part on the premise that sovereign immunity bars relief
> against States and their officers in both state and federal courts, and
> that certain suits for declaratory or injunctive relief against state
> officers must therefore be permitted if the Constitution is to remain
> the supreme law of the land.

*Alden v. Maine*, 527 U.S. 706, 747 (1999). Defendants recognize this well-

established exception, which permits suits for prospective injunctive relief against

---

[14] In *Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 779 (1991), the
Supreme Court stated:
> The Eleventh Amendment provides as follows: "The Judicial power
> of the United States shall not be construed to extend to any suit in
> law or equity, commenced or prosecuted against one of the United
> States by Citizens of another State, or by Citizens or Subjects of
> any Foreign State." Despite the narrowness of its terms, since *Hans
> v. Louisiana*, 134 U.S. 1 (1890), we have understood the Eleventh
> Amendment to stand not so much for what it says, but for the
> presupposition of our constitutional structure which it confirms:
> that the States entered the federal system with their sovereignty
> intact; that the judicial authority in Article III is limited by this
> sovereignty; and that a State will therefore not be subject to suit in
> federal court unless it has consented to suit, either expressly or in
> the "plan of the convention."
(Internal citations omitted).

state officials acting in violation of federal law. State officers sued in *Ex parte Young* cases must have "some connection" to the enforcement of the allegedly defective act. Defendants argue that because they are not specifically empowered to enforce the state statute in question, they do not have a sufficient connection with the act for which the Tribe is effectively suing the State.

Defendants are not required to have a "special connection" to the unconstitutional act or conduct. Rather, state officials must have a particular duty to "enforce" the statute in question and a demonstrated willingness to exercise that duty, *Ex parte Young*, 209 U.S. at 157, which Defendants have stipulated to in this case (Appellants' Am. App., vol. I, at 171). "The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact . . . ." *Ex parte Young*, 209 U.S. at 157.

Defendants, although not specifically empowered to ensure compliance with the statute at issue, clearly have assisted or currently assist in giving effect[15] to the law. Defendant Walker, as Director of Vehicles, manages vehicle registrations and titles and supervises vehicle reciprocity; Defendant Wagnon, as the Secretary of Revenue, is the State official—in connection with Defendant Walker—who decided to deny the validity of the Tribe's registrations; and Defendant Seck, as Superintendent of the Kansas Highway Patrol, enforces traffic

---

[15] "To give effect" is the definition of "enforce." Webster's Third New International Dictionary 751 (1986).

and other laws of the State related to highways, vehicles, and drivers of vehicles. This satisfies the "some connection" requirement of *Ex parte Young*.

We agree with the district court that Defendants' assertion that they are not proper parties because they cannot change state law to remedy the Tribe's concerns—but can only enforce the law as written—rests on faulty reasoning.[16] "[T]he essence of an *Ex parte Young* action is seeking relief against the state officials who are responsible for enforcing the violative state laws, not against the state officials who drafted the violative legislation." (Appellants' Am. App., vol. IV, at 1014 (District Court Opinion Aug. 6, 2003).)

The final issue is whether the district court erred in ruling that the relief requested by the Tribe does not violate the Tenth Amendment of the United States Constitution. Defendants claim the injunction requested by the Tribe violates the Tenth Amendment pursuant to *New York v. United States*, 505 U.S. 144 (1992), and *Printz v. United States*, 521 U.S. 898 (1997), because it is effectively a mandate by Congress to recognize the Tribe's motor vehicle licenses and titles.

*New York*[17] and *Printz*[18] stand for the proposition that Congress cannot

---

[16] We are similarly unimpressed with Defendants' circular argument that § 8-138a is "unenforceable" because the statute does not contain any specific language stating how it is to be enforced. (*See* Appellants' Br. at 53-56.) Obviously, § 8-138a has been enforced through § 8-142 in that three citations have been issued to tribally tagged motor vehicles.

[17] In *New York*, the Supreme Court held that a provision of the Low-Level Radioactive Waste Policy Act that required states to accept ownership of waste or

(continued...)

-21-

force states to enact or enforce federal regulatory programs.  However, as articulated by the district court,

> *Printz* and *New York* are easily distinguishable from the facts at hand, for here the government is not attempting to compel the state to enact or enforce a federal program.  Rather, plaintiff is merely asking the Court to enjoin the defendants from enforcing a *state* law that allegedly infringes on rights guaranteed to plaintiff by federal law.

(Appellants' Am. App., vol. IV, at 1016 (District Court Opinion Aug. 6, 2003).) "[T]his is a case about state law infringing on rights guaranteed by federal law, and there is no question that federal courts have the power to order state officials to comply with federal law." *Millie Lacs Band of Chippewa Indians v. Minnesota*, 124 F.3d 904, 928 n.44 (8th Cir. 1997), *aff'd* 526 U.S. 172 (1999). The permanent injunction requested by the Tribe does not mandate state participation in the enforcement of a federal statutory scheme; and, therefore, the Tenth Amendment has not been violated.

    **AFFIRMED**.

---

[17](...continued) regulate according to congressional instructions was inconsistent with the Tenth Amendment.  505 U.S. at 175-77.

[18] In *Printz*, the Court struck down a portion of the Brady Act that required state officers to implement a federal regulatory program as violative of the Tenth Amendment.  521 U.S. at 933 ("'The Federal Government may not compel the States to enact or administer a federal regulatory program.'" (quoting *New York* v. *United States*, 505 U.S. 144, 188 (1992))).